In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2753

MARTIN CHAIDEZ, *et al.*,

*Plaintiffs-Appellants*,

*v.*

FORD MOTOR COMPANY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-03244 — **Charles R. Norgle**, *Judge*.

ARGUED MAY 23, 2019 — DECIDED AUGUST 28, 2019

Before BAUER, MANION, and BRENNAN, *Circuit Judges*.

MANION, *Circuit Judge*. The plaintiffs, on behalf of themselves and those similarly situated, allege a racially discriminatory hiring scheme that has resulted in a lack of Hispanic and Latino line workers at Ford Motor Company's Chicago assembly plant. The district court dismissed the suit for failure to exhaust administrative remedies, holding the plaintiffs' claims were not "like or reasonably related to" the claims asserted in their EEOC charges. Because we conclude that the

claims included in Count II of the plaintiffs' complaint were properly exhausted before the EEOC, we vacate the district court's dismissal of Count II and remand for further proceedings. We also modify the district court's dismissal of Count I to be without prejudice.

## I. Background

The seven named plaintiffs are Hispanic or Latino individuals who applied for employment as line workers at Ford's Chicago assembly plant near Harvey, Illinois, but were not hired. Allan Millender is a black Ford employee and the Chairman of the United Auto Workers union for the Chicago plant. The plaintiffs allege a conspiracy between Millender, the staff of the Harvey unemployment office, and unknown Ford employees. This claimed conspiracy ensured the Chicago plant predominantly hired black employees to the exclusion of Hispanic and Latino applicants, allegedly because Millender believed black employees would be more likely to support him in his role as a union leader. This resulted in a predominantly black workforce at the plant and a dearth of Hispanic and Latino workers, despite a sizable minority of Hispanic and Latino people in the surrounding area.[1]

The complaint alleges line workers at the Chicago plant are hired exclusively through the Harvey unemployment office. The office collects application forms from individuals

---

[1] The plaintiffs allege in their complaint that "[t]he lack of Hispanic or Latino workers is not consistent with the racial demographics of the areas surrounding the Ford plant." In their EEOC charges, they more specifically allege "Local towns boast the following Hispanic populations: Hammond, Indiana (34%), Calumet City, Illinois (15%), Dixmoor, Illinois (46.6%), Midlothian, Illinois (20%), Harvey, Illinois (19%)."

interested in applying for line worker positions at the Chicago plant. These forms are then sent to Ford, which compiles the information and forwards it to Aon Consulting, a third-party firm that administers a variety of pre-employment tests. One test Aon administers is a basic skills test. Applicants who pass the required pre-employment tests, a drug test, and a background check are sent back to Ford to move forward in the hiring process.

The plaintiffs claim the actual operation of this hiring process, under Millender's influence and control, is discriminatory against Hispanic and Latino applicants. In February 2016, the named plaintiffs each filed an EEOC charge, alleging they were denied employment with Ford based on their race.[2] These charges were largely, though not entirely, identical. Each alleged Millender established a discriminatory hiring process, setting forth the following allegations:

(1) Hispanic and Latino applicants are intentionally discriminated against, or disparately impacted, by the pre-employment basic skills test;

(2) Even those Hispanic and Latino applicants that do pass this test are discriminated against by having their applications "stalled in some other way;"

(3) Those Hispanic or Latino applicants who are considered by Ford are rarely, if ever, hired; and finally

(4) Several non-Hispanic and non-Latino applicants have been hired without taking the basic skills test.

_____

[2] Each charge indicates the complainant was represented by counsel from Bizzieri Law Offices at the time of filing. The plaintiffs are still represented by counsel from that firm in this appeal, in addition to other attorneys.

Only one plaintiff (Stephanie Galan) alleged she person-
ally "took a pre-employment basic skills test." The others
simply alleged they filled out a pre-application questionnaire
and were either never contacted or not ultimately hired. None
of the charges alleged the plaintiffs were prevented from tak-
ing the basic skills test, or that their contact information was
destroyed or mishandled by the unemployment office staff or
not forwarded to Aon by Ford. Instead, each charge (even
those of the plaintiffs who did not allege they took the basic
skills test) included the following allegation: "By agreement
with the Harvey unemployment office, Hispanic applicants
are allowed to apply and take pre-employment tests, but
rarely pass basic skills testing." Thus, the focus of the charges
was on the discriminatory impact or administration of the
basic skills test, or the intentional stalling of the applications
of and/or refusal to hire those applicants who passed the test.

The plaintiffs each received "Right to Sue" letters from the
EEOC in January 2017. They commenced this case in federal
court in April 2017, seeking to certify it as a class action. They
set forth two claims under Title VII: disparate treatment
(Count I) and disparate impact (Count II). The complaint con-
tained allegations supporting two alternative theories of dis-
crimination: "Either the pre-employment testing creates an
impermissibly adverse impact on Hispanics and/or Latinos,
or Ford itself is excluding those of Hispanic and/or Latino de-
scent from being processed for hire."

Paragraphs 22–32 contain allegations supporting the first
theory:       "the       pre-employment      testing      creates      an

impermissibly adverse impact on Hispanics and/or Latinos." These paragraphs set forth the following allegations:

(1) Ford almost exclusively hires line workers through the Harvey unemployment office;

(2) Most, if not all, of the line workers hired are black;

(3) The plaintiffs each applied for a line worker position through the Harvey unemployment office, and each was qualified for such position, but they were not hired due to their race;

(4) Ford's hiring process results in an almost exclusively black workforce; and

(5) The lack of Hispanic and Latino line workers is inconsistent with local racial demographics.

Paragraphs 33–44 detail the second theory: "Ford itself is excluding those of Hispanic and/or Latino descent from being processed for hire." More specifically, paragraph 33 describes this theory as follows: "Alternatively, … the Harvey, Illinois unemployment office, at the direction of, and in concert with Millender, either does not accept, or destroys applications or contact information forms from Hispanic and/or Latino applicants; does not allow the applicants to take pre-employment testing, or otherwise interferes with applications of Hispanic and/or Latino applicants." Paragraphs 33–44 set forth the following allegations:

(1) At Millender's direction, the Harvey unemployment office staff "either do not forward [Hispanic applicants' contact information] to Ford for further testing,

or interfere in some other way with the application
process;"

(2) Hispanic applicants who have submitted information
forms "are not moved forward in the application pro-
cess and are never allowed to begin pre-employment
testing, let alone be hired;" and

(3) Even if Hispanic applicants are "forwarded to [Ford]
to be sent for pre-employment testing, … [Ford] fail[s]
to forward the contact information of [the applicants]
to its testing facility for hire."

Thus, the focus of this second theory is on discrimination dur-
ing the application phase prior to testing, caused by the un-
employment office staff and/or Ford employees preventing
Hispanic or Latino applicants from beginning testing at all.

In sum, one theory alleges disparate impact caused by the
skills test (the "skills-test disparate impact" theory). The alter-
native theory alleges disparate treatment through pre-test de-
struction of or interference with applications at the unem-
ployment office, and/or Ford's prevention of Hispanic or La-
tino applicants from testing at all (the "pre-test discrimina-
tion" theory). Count I ("Title VII-Disparate Treatment") ex-
pressly relies on the allegations of Paragraphs 33–44 (setting
forth the pre-test discrimination theory). Count II ("Title VII-
Disparate Treatment") relies on the allegations of Paragraphs
22–32 (setting forth the skills-test disparate impact theory).

The district court dismissed the complaint in its entirety,
holding the allegations in the complaint were inconsistent
with, and contradictory to, the allegations in the EEOC
charges. The district court focused on the apparent contradic-
tion between the charges' allegation that "Hispanic applicants

are allowed to … take pre-employment tests" and the complaint's allegation that Hispanic applicants "are never allowed to begin pre-employment testing." Thus, the district court held the claims in the complaint were not "like or reasonably related to" the claims in the charges. Therefore, the plaintiffs failed to exhaust their administrative remedies. The court dismissed the entire case on that basis. The plaintiffs appeal.

## II. Discussion

We review a district court's decision to dismiss a complaint *de novo*, accepting as true the complaint's well-pleaded allegations and drawing all reasonable inferences in the plaintiffs' favor. *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

The plaintiffs raise three issues on appeal. First, they argue the district court erred by concluding the complaint's claims were not like or reasonably related to the claims made in the EEOC charges. Second, they assert their complaint states plausible claims for relief sufficient to survive a Rule 12(b)(6) motion to dismiss. Third, they contend the district court abused its discretion by not allowing the plaintiffs to amend their complaint before dismissal.

### A. Failure to Exhaust Administrative Remedies

The main issue presented in this case is whether the claims asserted in the plaintiffs' complaint are like or reasonably related to the claims they asserted in their EEOC charges. Before bringing a Title VII claim, a plaintiff must first exhaust his administrative remedies by filing charges with the EEOC and receiving a right to sue letter. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). After doing so, a plaintiff filing

suit in federal court "may bring only those claims that were included in her EEOC charge, or that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005). This requirement has two purposes: first, it allows the EEOC and the employer an opportunity to settle the matter, and second, it ensures that the employer has adequate notice of the conduct the employee is challenging. *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009).

Claims are "like or reasonably related" when (1) "there is a reasonable relationship between the allegations in the charge and the claims in the complaint" and (2) "the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). The charge and complaint "must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Id.* at 501 (emphasis in original). A plaintiff cannot bring a new claim that is "inconsistent with" the claim in his EEOC charge, even if the new claim "involves the same parties and the same facts as the other claim." *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 526 (7th Cir. 2008). The fact that the charge and complaint generally assert the same kind of discrimination is not sufficient, without some factual relationship between them. *Cheek*, 31 F.3d at 501.

Determining whether the complaint and the EEOC charges contain claims that are "like or reasonably related to" each other requires a careful examination and comparison of the charges and the complaint.[3] Because the charges and

---

[3] Generally, a court must read the claims in the EEOC charge liberally, because such charges are often initiated by laypersons rather than

complaint must, "*at minimum*, describe the same conduct and implicate the same individuals," *Cheek*, 31 F.3d at 501 (emphasis added), we begin by focusing on the conduct described and individuals implicated in each.

When the plaintiffs submitted their charges to the EEOC, they identified a specific discriminatory scheme: Hispanic and Latino applicants are made to take a basic skills test that at least some other applicants are not required to take, and those who pass this testing phase are thereafter stalled by Ford employees during the hiring process or simply not hired. The charges each alleged Hispanic and Latino individuals are allowed to begin testing, indicating the discrimination occurs either through the testing itself or thereafter. The fact that six of the seven plaintiffs did not allege they proceeded to testing does not change the clear focus of the express allegations on the test and post-test hiring process. The conduct of which Ford was notified, and of which the EEOC and Ford had an opportunity to seek settlement, was focused on the test and the post-test hiring process.

Furthermore, the only persons implicated in the charges were Ford and Millender. Although the charges mentioned the unemployment office multiple times, they only assert that Ford hires almost exclusively through the unemployment office and that the office, by agreement, allows Hispanic and Latino applicants to begin testing. The charges contain no

---

lawyers. *Teal*, 559 F.3d at 691. However, where the plaintiff was represented by counsel when the EEOC charge was filed, "the argument for liberal construction" is "weaken[ed]." *Id.* That is the case here.

allegation of misconduct attributable to the unemployment office.[4]

Next, we turn to the claims and allegations of the plaintiffs' complaint. In Count I of the complaint, the plaintiffs claim a scheme of discrimination that focuses on the pre-test application process, including new claims that Hispanic and Latino applicants' contact information is destroyed or interfered with by employees at the Harvey unemployment office. Count I alleges Hispanic and Latino applicants "are never allowed to begin pre-employment testing." This was not the misconduct of which the EEOC charges placed Ford on notice or provided an opportunity for settlement. As we stated in *Rush v. McDonald's Corp.*:

> An aggrieved [plaintiff] may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination. This limitation … gives the employer some warning of the conduct about which the [plaintiff] is aggrieved, and it affords the agency and the employer an opportunity to attempt conciliation without resort to the courts.

966 F.2d at 1110.

---

[4] The most accusatory statement leveled against the unemployment office in the charges is that "Mr. Millender's agreement with the Harvey unemployment office has ensured a gross underrepresentation of Hispanic workers at Ford." But the "agreement" referenced is the agreement to allow Hispanic and Latino applicants to apply and begin testing. Even construing the charges liberally and drawing all reasonable inferences in the plaintiffs' favor, this statement can, at most, be understood to mean the unemployment office was involved in allowing Hispanic applicants to take a test that resulted in a disparate impact.

The plaintiffs are not saved by the charges' allegation that applications are in some instances "stalled in some other way." The charges alleged it was only "in the event that Hispanic applicants do pass basic skills testing" that their applications are "stalled in some other way." Thus, this allegation can only be understood to refer to the post-test hiring process at Ford. The plaintiffs cannot use this single sentence to shoehorn into their EEOC charges new claims about pre-test mishandling of applications at the unemployment office.

However, Count II describes conduct that is consistent with the conduct described in the charges. Count II alleges a disparate impact upon Hispanic and Latino applicants caused by the skills test. By comparison, the charges also alleged, in part, that the basic skills test caused a disparate impact on Hispanic and Latino applicants. Count II implicates the same individuals as the charges: Ford and Millender. Like the charges, Count II only references the unemployment office's role in the hiring process generally, and that Ford hires line workers almost exclusively through that office. The claims and allegations included in Count II are consistent with the claims and allegations in the charges.

In sum, Count I's new claims of pre-test discrimination are not included in the EEOC charges. They are, at best, incongruent with the allegations made in the charges (at worst, directly contradictory). Thus, the claims are not "like or reasonably related" to the claims in the EEOC charges, and the district court properly dismissed them on that basis. *See Miller*, 525 F.3d at 526. However, the complaint expressly asserts the pre-test discrimination as an "alternative" theory. Count II asserted a claim that *was* included in the EEOC charges: namely, the disparate impact of the basic skills test. That claim was properly

exhausted before the EEOC, and therefore Count II should not have been dismissed.

## B. Adequacy of the Complaint

Because the district court dismissed the suit for failure to exhaust administrative remedies, the court did not address whether the complaint stated plausible claims for relief sufficient to survive a 12(b)(6) motion. However, we may affirm the judgment on any basis within the record. *Rocha v. Rudd*, 826 F.3d 905, 909 (7th Cir. 2016). Ford urges us to hold, in the alternative to holding that the plaintiffs failed to exhaust their administrative remedies, that the plaintiffs failed to state plausible claims for relief.

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Since we affirm the dismissal of Count I, we focus only on the adequacy of the plaintiffs' Count II disparate-impact claim. To plausibly state a disparate-impact claim under Title VII, a plaintiff must demonstrate the defendant has established an employment practice that causes a disparate impact "on the basis of race, color, religion, sex, or national origin." *Adams v. City of Indianapolis*, 742 F.3d 720, 730–31 (7th Cir. 2014) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). Unlike a disparate-treatment claim, a disparate-impact claim does not require the plaintiff to show intentional discrimination, "but the employer may defeat the claim by showing that the challenged employment practice is job-related and consistent with business necessity." *Id.* at 731. In *Adams v. City of Indianapolis*, we stated "[d]isparate-impact plaintiffs are permitted to rely on a variety of statistical methods and comparisons to support their claims. At the pleading

stage, some basic allegations of this sort will suffice." *Id.* at 733.

Ford relies on *Adams* to argue the plaintiffs have failed to state a plausible disparate-impact claim. In *Adams*, we affirmed the dismissal of a "complex disparate-impact case"[5] where the complaint "allude[d] to disparate impact in wholly conclusory terms." We noted complex-discrimination-claim plaintiffs must plead a higher level of factual specificity, and yet the complaint in *Adams* demonstrated "a complete lack of factual content directed at disparate-impact liability." *Id.*

We note that although the discriminatory conspiracy described in Count I is quite complex, Count II's claim is more straightforward. It alleges Ford's pre-employment testing process has created a racially disproportionate workforce and a dearth of Hispanic or Latino workers. Count II alleges the racial makeup of Ford's workforce "is not consistent with the racial demographics of the areas surrounding the Ford plant." It alleges Ford's workforce is primarily black and lacks more than even a small percentage of Hispanic and Latino workers. It identifies the pre-employment testing process as the employment practice that has resulted in this disproportionate lack of Hispanic and Latino line workers. The plaintiffs also

---

[5] The disparate impact in *Adams* was allegedly the result of a complicated testing process to determine promotion eligibility at the Indianapolis police and fire departments. The challenged process involved combining several test scores, an interview, and a personnel file evaluation for each candidate into a composite score and ranking each candidate according to those scores, while also allowing for a degree of discretion in promotion decisions. The plaintiffs alleged that the testing was racially and culturally biased and that the process had been manipulated. *Adams*, 742 F.3d at 724–25.

attached as exhibits to their complaint several photographs of the most recent classes of new hires at the Chicago plant as support for their factual allegations regarding the racial makeup of Ford's workforce.

Ford may present contrary evidence at the summary judgment stage or at trial to show there is no suspect racial disparity, and the plaintiffs, for their part, will need to utilize the discovery process to support their allegations with statistical and comparative evidence. *Adams*, 742 F.3d at 733; *Bennett v. Schmidt*, 153 F.3d 516, 519 (7th Cir. 1998); *see also Vitug v. Multistate Tax Com'n*, 88 F.3d 506, 513–14 (7th Cir. 1996) (affirming summary judgment against Title VII disparate-impact claim where plaintiff failed to provide sufficient statistical evidence to show the challenged employment action had a negative effect on minority job applicants). Ford may also defeat the plaintiffs' claim by demonstrating the pre-employment testing process is "job-related and consistent with business necessity." *Adams*, 742 F.3d at 731. But the plaintiffs' "basic allegations" regarding the disparity between the racial makeup of Ford's workforce and the surrounding area are sufficient to survive a motion to dismiss. *Id.* at 733.

## C. Denial of Leave to Amend

Finally, the plaintiffs argue the district court abused its discretion by dismissing the complaint without leave to amend. It is ordinarily true that "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *NewSpin Sports, LLC v. Arrow Electronics, Inc.*, 910 F.3d 293, 310 (7th Cir. 2018). However, Ford asserts the plaintiffs failed to properly request leave to amend before the district court and it is too late to

seek leave now. A district court does not "abuse its discretion by failing to order, *sua sponte*, an amendment to [the complaint] that [the plaintiff] never requested." *Wagner v. Teva Pharms. USA, Inc.*, 840 F.3d 355, 359 (7th Cir. 2016).

It is not entirely true the plaintiffs never sought leave to amend. The plaintiffs' brief opposing Ford's Motion to Dismiss included the following as the final sentence of its conclusion: "In the alternative, Plaintiffs seek leave to amend their Complaint." Other circuits have held that this kind of single-sentence request included within a responsive brief is not sufficient to render the district court's dismissal without leave to amend an abuse of discretion. *See, e.g.*, *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1187 (10th Cir. 1999). We agree. The plaintiffs' single-sentence request, providing no grounds for amendment or explanation of how an amended complaint would cure the defects of their original complaint, does not amount to a motion for leave to amend. The plaintiffs never filed a proper motion seeking leave to amend, either before or after the district court entered judgment. *See NewSpin Sports*, 910 F.3d at 311 (reversing a district court's denial of leave to amend where the plaintiff timely filed a post-judgment request to amend and attached a proposed amended complaint). Under these facts, the district court did not abuse its discretion by not granting leave to amend.

However, given that the sole basis for dismissal was a failure to exhaust administrative remedies, the claims should have been dismissed without prejudice, "thereby leaving the plaintiff[s] free to refile [their] suit when and if [they] exhaust[] all of [their] administrative remedies or drop[] the unexhausted claims." *Greene v. Meese*, 875 F.2d 639, 643 (7th Cir. 1989). Although the plaintiffs' Count I claims may no longer

be timely, *see* 42 U.S.C. § 2000e-5(e)(1) (requiring EEOC charges to be filed within 180 days of the challenged employment action), it is worthwhile to follow the proper course of dismissal without prejudice and leave any potential timeliness issue for the plaintiffs to work out. *See, e.g.*, *Teal*, 559 F.3d at 693 (remanding with instructions to dismiss without prejudice for failure to exhaust administrative remedies before the EEOC, even though complained-of employment action occurred nearly six years prior).

Although the district court's dismissal order made no mention of whether the claims were dismissed with or without prejudice, a dismissal is generally presumed to be with prejudice. Fed. R. Civ. P. 41(b). *But see Green*, 875 F.2d at 643 ("[T]he norm regarding the character of dismissals for failure to exhaust administrative remedies may be sufficiently well established to override the implication from Rule 41(b) of the judge's failure to specify that he was dismissing [the] case without prejudice, [but] it would be better if judges were explicit on this score."). In any event, it is within our power to modify the judgment to be without prejudice for the claims that were properly dismissed, and we do so.

### III. Conclusion

Accordingly, we AFFIRM the district court's dismissal of Count I but MODIFY the judgment to be without prejudice, and we VACATE the dismissal of Count II and REMAND to the district court for further proceedings consistent with this opinion.