# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 4, 2025          Decided April 18, 2025

No. 23-7141

SAMUEL SHANKS,
APPELLANT

v.

INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED
CRAFTWORKERS,
APPELLEE

———

Consolidated with 23-7145

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:23-cv-00311)
(No. 1:23-cv-00309)

———

*Samuel Shanks*, *pro se,* was on the briefs for appellant.

*Taylor Lambert*, *pro se*, was on the briefs for appellant.

*Gail S. Coleman*, Attorney, Equal Employment Opportunity Commission, argued the cause for *amicus curiae* in support of appellants. With her on the brief were *Karla Gilbride*, General Counsel, *Jennifer S. Goldstein*, Associate

General Counsel, and *Dara S. Smith*, Assistant General Counsel.

*Alexandra Mansbach*, appointed by the court, argued the cause as *amicus curiae* in support of certain of appellants' claims. With her on the briefs were *Ruthanne M. Deutsch* and *Hyland Hunt*, appointed by the court.

*Kathleen Keller* argued the cause for appellee. With her on the brief was *Kara A. Naseef*. *Caitlin Kekacs* entered an appearance.

Before: PILLARD and GARCIA, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* ROGERS.

ROGERS, *Senior Circuit Judge*: Before the court are appellants' remaining allegations of discrimination by their employer, appellee. The court affirmed in part the dismissals of the *pro se* complaints for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and appointed *amicus curiae* to present arguments in favor of the claims unsuited to summary dismissal.[1] Upon review after briefing and oral arguments, the court affirms the judgments of dismissal except on claims of disparate impact and discriminatory treatment that cross the line from conceivable to plausible, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). That aspect of the district court orders is reversed and remanded.

---

[1] The court expresses appreciation of the assistance provided by *amicus curiae*.

3

## I.

Appellants are former employees of the International Union of Bricklayers & Allied Craftworkers. Each sued the Union as their employer in 2022, proceeding *pro se* in the Superior Court of the District of Columbia. Samuel Shanks worked in accounting for over twenty years and alleged discrimination based on his disability, race, color, and sexual orientation. He also alleged that the Union management subjected him to a hostile workplace due to those characteristics and retaliated against him for his workplace advocacy. He alleges that the Union violated the D.C. Human Rights Act, the Americans with Disabilities Act of 1990, Title VII of the Civil Rights Act of 1964, and "other applicable Civil Rights Acts." Taylor Lambert, his niece who began working for the Union as a temporary employee in 2015 and became a full-time employee in 2019, alleged wrongful termination, retaliation, and discrimination by the Union based on her race, religion, and gender in violation of Title VII of the Civil Rights Act of 1964 and "other Civil Rights Acts."

Following the Union's federal-question removal of the cases to the federal court, 28 U.S.C. § 1441(a), the district court granted the Union's motions to dismiss the *pro se* complaints for failure to state a claim, FED. R. CIV. P. 12(b)(6). *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, No. 23-311, 2023 WL 6199078, at *6 (D.D.C. Sept. 22, 2023); *Lambert v. Int'l Union of Bricklayers & Allied Craftworkers*, No. 23-309, 2023 WL 6388953, at *6 (D.D.C. Sept. 29, 2023). Shanks and Lambert appealed, and this court affirmed in part the judgments of dismissal and appointed *amicus* to present any potentially meritorious arguments in favor of the claims unsuited to summary dismissal. *Order*, *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, No. 23-7141 (D.C. Cir. May 29, 2024) ("*Shanks Order*"); *Order*, *Lambert v. Int'l*

*Union of Bricklayers & Allied Craftworkers*, No. 23-7145 (D.C. Cir. May 29, 2024) ("*Lambert Order*"). This court reviews the district court's Rule 12(b)(6) dismissal of a complaint *de novo*. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240 (D.C. Cir. 2018).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), addressing the pleading requirements of FED. R. CIV. P. 8(a)(2)). Facial plausibility exists when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although this standard "is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Consequently, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The court must accept the factual allegations in the complaint as true, *id.*, and view them in a "context-specific" setting while "draw[ing] on its judicial experience and common sense," *id.* at 679 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007)).

The *pro se* nature of a complaint places a further gloss on the standard of review. In addition to according a "plaintiff the benefit of all inferences that can be derived from the facts alleged," *Zinke*, 892 F.3d at 1240, a *pro se* complaint must be "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The court will "consider a *pro se* litigant's

complaint in light of all filings, including filings responsive to a motion to dismiss." *Ho v. Garland*, 106 F.4th 47, 50 (D.C. Cir. 2024) (quoting *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015)).

For the following reasons, then, the court concludes that when viewed in the context of the Union's alleged treatment of minority employees and considered as a whole, there are allegations of racial discrimination as a result of the Union's COVID-19 policy that cross the line from conceivable to plausible. *Iqbal*, 556 U.S. at 680.

## II.

The following factual allegations are largely undisputed. In response to the COVID-19 pandemic, the Union announced on June 6, 2021, by email to its employees a COVID-19 Continuing Readiness Plan, which included safety and health protocols regarding vaccines. The plan stated the Union would resume full in-office work beginning September 7, 2021. All employees were encouraged to "[c]onsider getting a COVID-19 vaccine as soon as you can." The plan further stated "essential business travel" would be resumed and specified: "Proof of vaccination (vaccination card) will be requested before you engage in business travel." Exceptions to the vaccination requirement would be allowed only for those with a disability or sincerely held religious belief. Shanks' and Lambert's claims largely flow from this announcement. They alleged that employees who engaged in business travel for the Union, who were mostly white, were on notice as of June 6 that they were required to get the COVID-19 vaccine. By contrast, employees whose duties did not include business travel, who were mostly Black, were not required to get vaccinated.

An all-staff meeting was held the day after the June 6 announcement to discuss the Union's plan and COVID-19 policy. Additionally, a vaccine hesitancy webinar would be held on June 16, featuring the head of the National Institutes of Health, to provide "insights into the latest trends and developments surrounding the pandemic, address questions, and dispel myths related to the pandemic and vaccination initiatives." The webinar was primarily directed toward members of the Union's Employer Council, but headquarters employees who engaged in business travel were also invited. Headquarters employees who did not engage in business travel were not invited. And when a link to the recording of the webinar was emailed to Union members, the non-traveling employees were allegedly again left out.

On August 19, 2021, by email to its employees, the Union announced a revised COVID-19 policy. It stated "all employees will be required to be fully vaccinated against COVID 19" by October 4. The policy specified: "An employee will be considered 'fully vaccinated' two weeks after receiving a second dose in a two-dose series, such as the Pfizer or Moderna vaccines, or two weeks after receiving a single dose of a one-dose vaccine, such as the Johnson & Johnson vaccine." Any employee not fully vaccinated would be suspended without pay for one week, and an employee who failed to provide proof of being "fully vaccinated" after that week would "be terminated." Employees had until September 13 to request an accommodation for reasons of disability or a sincere religious belief.

No follow-up staff meeting was scheduled after the August 19 announcement. Head Shop Steward Mosely sought a meeting with the Union's management to urge that it extend the September 13 deadline to request accommodations, based in part on non-traveling employees' difficulties in securing

appointments with their medical doctors before the deadline. The meeting was initially scheduled for September 7 but twice postponed by the Union. A meeting finally occurred on September 20. By then the September 13 deadline had passed. On October 1, the Union extended the October 4 vaccine deadline to October 18 but did not extend the September 13 deadline for requesting accommodations.

On October 4, Shanks sent emails to the Union president and to General Counsel O'Connor and the Human Resources Manager, stating that the COVID-19 mandate will "overly affect" Black employees in comparison to other groups. Shanks noted the tight deadlines to receive a vaccine or speak with a doctor or religious leader about an accommodation, the need for an interim testing option (at no cost to the Union), and that Black Americans are the most vaccine hesitant group due to documented medical experimentation on them in the Tuskegee Experiment and as slaves. Lambert also emailed the Union on October 4, stating her personal objection to being vaccinated. Upon notifying the Union they were not vaccinated, access to their email accounts was blocked. Shanks was suspended without pay on October 5 and fired on October 12. Lambert alleged she was fired when the Union treated her October 4 email as a resignation.

## III.

In the remaining allegations of racial discrimination before this court, Shanks and Lambert focus on the Union's two-stage roll-out of the COVID-19 vaccination policy. They claim this had a disparate impact on them as Black non-traveling employees and resulted in their discriminatory treatment. Shanks alleged in his *pro se* complaint that the "unevenly applied Covid 19 Vaccination Policy . . . would cause *additional* disparate impact/treatment to Black American

employees compared to our white counterparts." Compl. 1 (referring to his October 4 emails, emphasis added). He opposed the Union's motion to dismiss his complaint on the same grounds. Shanks Opp'n to Mot. to Dismiss 15. Shanks and Lambert claimed that as a result of the Union's COVID-19 policy, six employees (five of whom were Black) were suspended and three Black employees were fired. Shanks Opp'n to Mot. to Dismiss 27; Lambert Opp'n to Mot. to Dismiss 25.

## A.

For a disparate impact claim, "a plaintiff must generally 'demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group.'" *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1085–86 (D.C. Cir. 2011) (quoting *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006)). At the motion to dismiss stage, a plaintiff must plausibly allege that a disparity exists and identify a practice or policy that plausibly caused the disparity. *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020); *cf. Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017).

In their *pro se* complaints and oppositions to the Union's motions to dismiss, Shanks and Lambert identified a specific employment policy in the Union's COVID-19 vaccination policy, which was implemented at different times and with different informational resources for traveling and non-traveling employees, even though both groups of employees had to comply by the same vaccination and accommodation request deadlines. To demonstrate this had a disproportionate effect on the Headquarters' Black employees they offered statistics showing a disparate impact by race. *See* Shanks Compl. 1; Shanks Opp'n to Mot. to Dismiss 12–14, 27;

Lambert Compl. 1; Lambert Opp'n to Mot. to Dismiss 21–25, 38–40.

Notably, the Union's two-stage roll-out of the COVID-19 policy meant there were different procedures for traveling and non-traveling employees that made complying with the COVID-19 mandate more difficult for the non-traveling employees, a majority of whom were Black. These employees had far less time to comply with the COVID-19 policy and less information to assist them in resolving their concerns about the vaccines. Although 75% of white employees had 118 days to comply because they were traveling, only 11% of Black employees were traveling and accorded the same amount of time and information. Lambert Opp'n to Mot. to Dismiss 21, 38. In contrast, non-traveling employees were afforded approximately seventy-two days less time to obtain their first dose of a two-dose vaccine: a non-traveling employee receiving a two-dose (Moderna or Pfizer) vaccine would need to receive a first dose within four or eleven days, respectively, of the August 19 announcement of the revised COVID-19 policy to be "fully vaccinated" by October 4. Shanks Email Oct. 4, 2021. Although employees theoretically had eighteen days to receive the one-dose vaccine to meet the October 4 deadline, that vaccine (Johnson & Johnson) had allegedly been taken off the market due to adverse reactions. Shanks Opp'n to Mot. to Dismiss 15.

The *pro se* plaintiffs pointed to a clear statistical difference between Black and white employees under the Union's COVID-19 policy. *See Davis v. District of Columbia*, 925 F.3d 1240, 1251 (D.C. Cir. 2019). Shanks and Lambert compared the rates at which Union employees were fired or adversely affected. Taking as a true benchmark the Union's 51 white employees and 37 Black employees, for a total of 124 employees: 8% of Black compared to 0% of white employees

were fired, and 13.5% of Black employees were adversely affected, compared to 2% of white employees. *See* charts, Exh., Shanks Opp'n to Mot. to Dismiss; Lambert Opp'n to Mot. to Dismiss 21, 25.

In other words, *amicus* points out, Black employees were adversely affected at a rate nearly seven times that of white employees. Amicus Br. 30. Roughly 41% of the Union's total employees were white and roughly 30% were Black. Even if Lambert were excluded because, as the Union maintained, she resigned October 4, *amicus* noted there is still a substantial racial disparity, with 11% of Black employees adversely affected compared to only 2% of white employees. *Id.* at 30 n.14. Further, 100% of the employees who were fired were Black (none were white). Looking beyond firings to include suspensions, 83% of the adversely affected employees were Black. *Id.* at 31. The percentages of all those fired (100%) or adversely affected (83%) who are Black are markedly disproportionate to the percentage of all Union employees who are Black (30%). *Id.* at 31.

Shanks and Lambert have not cherrypicked the statistics in the manner the Union suggests. Their preliminary statistics suffice at the pleading stage to allege "a disproportionate impact on the minorities in the total group to which the [COVID-19] policy was applied." *Greater New Orleans*, 639 F.3d at 1086 (quoting *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984)). Comparison of the rate of adverse effects on two comparator groups is appropriate. *See Mandala*, 975 F.3d at 210 (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 651 (1989)); *Davis*, 925 F.3d at 1251. Their statistics about Black and white employees fired and adversely affected as a result of the Union's COVID-19 policy can offer "a sound benchmark for assessing the disparateness of" the policy, not a

"completely artificial metric." *Greater New Orleans*, 639 F.3d at 1086, 1087.

Likewise, the Union's focus on the small number of adversely affected employees overlooks that at the initial pleading stage "basic allegations" of statistical comparisons can suffice. *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014). In *Chaidez v. Ford Motor Company*, 937 F.3d 998 (7th Cir. 2019), the plaintiffs simply alleged "the racial makeup of [the defendant's] workforce is not consistent with the racial demographics of the areas surrounding the . . . plant," *id*. 1007 (internal citation and quotation marks omitted). *See Divine Equal. Righteous v. Overbrook Sch. for the Blind*, No. 23-846, 2023 WL 4763994, at *7 (E.D. Pa. July 26, 2023). Although a plaintiff must demonstrate "that the challenged practice *actually* has a disparate impact," Shanks and Lambert need not offer a statistical analysis that meets the *prima facie* standard. *Mandala*, 975 F.3d at 209–10; *see Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). As the Second Circuit explained, at this initial stage of the proceedings a plaintiff's complaint need not "prove in detail the methodological soundness of her statistical assessment to survive a motion to dismiss" and a complaint need not "supplement its statistical analysis with corroborating evidence." *Mandala*, 975 F.3d at 209–10.

Shanks and Lambert also asserted that the Union provided less information to non-traveling employees than to traveling employees to assist them in resolving their concerns about the COVID-19 vaccines. No staff meeting was scheduled after the August 19 announcement to discuss the revised COVID-19 policy and answer questions. Only traveling employees (who represent 75% of the Union's white employees and only 11% of its Black employees) were invited to the June 16 webinar, and a recording of the webinar was not made available to the

non-traveling employees (who represent 25% of the Union's white employees and 89% of its Black employees). Shanks Opp'n to Mot. to Dismiss 13; Lambert Opp'n to Mot. to Dismiss 22. According to Lambert, 89% of Black employees were "excluded . . . from participating" in the June 16 vaccine hesitancy webinar. Lambert Opp'n to Mot. to Dismiss 38. Yet as a member of the COVID-19 Community Corps, the Union received information from the federal government that Black Americans as a group have a higher level of vaccine hesitancy than white Americans. Shanks Opp'n to Mot. to Dismiss 3; Lambert Opp'n to Mot. to Dismiss 20–21.

Critically, non-traveling employees were afforded far less time to apply for an accommodation: just 25 days as opposed to as much as 99 days for traveling employees. Union management denied the representative of these mostly Black employees a timely meeting to explore extending the September 13 deadline for requesting accommodations. Viewed most favorably to the *pro se* plaintiffs, the Union's October 18 extension of the vaccination period did not provide adequate time for newly vaccinated employees to be "fully vaccinated."

The district court does not appear to have questioned that Shanks and Lambert had identified a policy and suffered an adverse effect, only that they had failed to plead causation. The court found Shanks "failed to plead facts that plausibly allege that he was terminated for reasons other than his violation of the Policy," *Shanks*, 2023 WL 6199078, at \*11, and Lambert was fired "because of [her] own voluntary failure to adhere to the Policy and failure to request an accommodation," *Lambert*, 2023 WL 6388953, at \*10. On appeal the Union reprises its argument that in "nearly all cases applying disparate impact theory over the past fifty years, the policy under attack imposed some barrier that was related to the protected status of the

demographic group challenging it." Appellee's Br. 47. According to the Union, Shanks and Lambert faced no race-related barrier to getting vaccinated and their refusal was a voluntary choice not to comply. This misstates the causation analysis.

Under appellants' theory of the case, the Union's vaccine policy imposed a race-related barrier because, due to a history of discrimination and mistreatment by the medical establishment, Black Americans are more likely than whites to be skeptical of vaccines. Taking appellants' allegations as true, the Union affirmed as much. The Union was a member of the COVID-19 Community Corps, which "highlighted the need to especially reach out to Black Americans," who due to mistreatment by medical authorities, are disproportionately likely to be vaccine hesitant. Shanks Opp'n to Mot. to Dismiss 3. The Union's webinar for its Employer Council was aimed at addressing such vaccine hesitancy. These allegations frame vaccine hesitancy as the result of historical inequalities of which the Union was aware, in line with the paradigmatic disparate impact cases. *See, e.g.*, *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–32 (1971).

Further, courts have consistently considered disparate impact claims even though plaintiffs' voluntary "choice" played some role in the circumstances that caused them to violate a policy. But under the Union's restrictive theory, Black plaintiffs would have lacked a viable disparate impact challenge to Duke Power's high school degree requirement for inter-plant transfers because they "chose" not to complete high school. *Griggs*, 401 U.S. at 430–32. So too, plaintiffs who chose to enter the country without documentation, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 427–29 (4th Cir. 2018), or did not move into an area covered by an employer's residency requirement, *NAACP v. N. Hudson Reg'l*

*Fire & Rescue*, 665 F.3d 464, 469, 479–81 (3d Cir. 2011), or chose not to entertain competing job offers at other institutions and missed out on retention raises, *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1224 (9th Cir. 2021), or refused to take a loyalty oath for religious reasons, *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1227–28 (9th Cir. 2023). Moreover, in *New York City Transit Authority v. Beazer*, 440 U.S. 568, 573–76, 585–87 (1979), the Supreme Court assumed a policy against employing methadone users could cause a disparate racial impact even though methadone use was a choice.

In sum, Shanks and Lambert's *pro se* allegations of disparate impact are neither deficient because conclusory "bare assertions," as in *Twombly*, *see Iqbal*, 556 U.S. at 681, nor contrary to the law on causation. The Union's motions for Rule 12(b)(6) dismissal of the *pro se* complaints overlooked favorable inferences flowing from the statistics and failed to construe the complaints liberally. *See Pardus*, 551 U.S. at 94. On remand, the district court can parse the claims among Shanks and Lambert in considering the Union's arguments for bringing this litigation to a close. For now, viewing the *pro se* allegations as true, *Ho*, 106 F.4th at 50, the disparate impact allegations of racial discrimination cross from "conceivable to plausible," *id.* at 51 (quoting *Brown*, 789 F.3d at 152, in turn quoting *Twombly*, 550 U.S. at 570).

**B.**

"[T]he two essential elements" for a discriminatory treatment claim under Title VII and the D.C. Human Rights Act, "are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *see Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553 (D.C. Cir. 1997). A

complaint "does not need detailed factual allegations," *Twombly*, 550 U.S. at 555, but must raise an inference "that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added); *see Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014). The court's "role is not to speculate about which factual allegations are likely to be proved after discovery," but only to consider whether the "alleged facts that, taken as true, render [their] claim . . . plausible." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

There is obvious overlap between the disparate impact and discriminatory treatment claims in Shanks' and Lambert's *pro se* complaints. Again, they alleged the Union adopted a COVID-19 policy that accorded most Black employees significantly less time to comply or seek an accommodation than most white employees and provided fewer resources to assist them in resolving vaccine concerns despite knowing their racial group was far more likely to be vaccine hesitant than whites. These circumstances may support the low threshold for an inference that the Union's policy would have adverse effects on the non-traveling employees, a majority of whom were Black, but may not always be sufficient to support an inference of discriminatory motivation. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979).

"There are multiple ways in which circumstantial evidence may support an inference" of "invidious motive," including "the employer's 'general treatment of minority employees.'" *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015) (quoting *Brady*, 520 F.3d at 495 n.3). Here, Shanks and Lambert allege that at Union Headquarters where they worked there were ongoing salary and benefit disparities between white and non-white employees, and that they personally had repeatedly

brought these issues to the attention of Union management to no avail. Shanks Compl. 1; Lambert Compl. 1; Shanks Opp'n to Mot. to Dismiss 6–8, 11; Lambert Opp'n to Mot. to Dismiss 13, 31–32. Shanks pled, for instance, that the Union management repeatedly "targeted" Black employees to punish them and was "over policing" them. Shanks Opp'n to Mot. to Dismiss 9, 12. Shanks and Lambert pled that non-white employees were denied promotion opportunities. Shanks Opp'n to Mot. to Dismiss 10–11; Lambert Opp'n to Mot. to Dismiss 31. And they allege the Union management has ignored these problems and concerns. Shanks Compl. 1; Shanks Opp'n to Mot. to Dismiss 6; Lambert Opp'n to Mot. to Dismiss 39.

The Union justified its August 19, 2021, COVID-19 policy mandating vaccines as one of "the steps necessary to keep [the] workplace safe" upon the "return to full on-site operations." Human Res. Mem. (Aug. 19, 2021). As of July 31, 2023, the Union still had not returned to full on-site operations. Such "changes and inconsistencies' in the employer's given reasons" for the challenged policy are treated by the court as an additional circumstance that can support an inference of discrimination. *Allen*, 795 F.3d at 40.

At the threshold stage of the proceedings before discovery, the court's conclusion is necessarily limited. *Harris*, 791 F.3d at 70. Viewed contextually as a whole and liberally construing the *pro se* complaints, the allegations on which Shanks and Lambert rely for an inference that race was a motivating factor in the termination of their employment "nudge" their discriminatory treatment claims from "conceivable to plausible." *Ho*, 106 F.4th at 51 (internal quotations and citations omitted). It remains for the district court on remand to parse the claims among Shanks and Lambert in considering

the Union's arguments for bringing this litigation to a close and to determine the nature of further proceedings.

**IV.**

To the extent appellants seek to pursue claims of discrimination on grounds other than race, those claims were insufficiently pled to survive the Union's Rule 12(b)(6) motions to dismiss. Shanks' allegation that the Union discriminated against him based on his sexual orientation, and Lambert's allegations that the Union discriminated against her based on her gender and religion are not "squarely and distinctly" spelled out in their pleadings. *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). Such passing references without developed circumstance or sufficient context are insufficient. *See Iqbal*, 556 U.S. at 679. This court has affirmed the dismissal of Lambert's claims related to her March 2021 suspension, which is the only context in which she claimed sex discrimination on appeal. *Lambert Order* at 1 (May 29, 2024).

Shanks' allegation of a hostile work environment is also deficient. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17 (2002). "In determining whether an actionable hostile work environment claim exists, [the court] look[s] to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 116 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). A "plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is '*sufficiently severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201

(emphasis added). A claim that "consists of several individual acts" may "become actionable due to their 'cumulative effect,'" but those actions "must be 'adequately linked' such that they form 'a coherent hostile environment claim.'" *Baird v. Gotbaum*, 792 F.3d 166, 168–69 (D.C. Cir. 2015). To determine whether individual acts are adequately linked, the court considers the frequency of the individual acts and whether they involve the same managers and the same kind of employment action. *Id.* at 169.

Shanks' hostile work environment claim spans 14 years, from 2007 through 2021, and involves a variety of Union managers and employment actions. The alleged individual acts — *e.g.*, ignoring questions submitted in person or by email, issuing a citation for a policy violation, and failing to provide resources to address vaccine hesitancy — are separated in time by many months or years and are inadequately linked. *Baird*, 792 F.3d at 168–69. So too, claimed salary disparity and denials of promotion and cost-of-living increases are insufficiently pled where personnel actions are summarily alleged, discrete, or not so hostile or abusive as to alter the conditions of employment by "subject[ing] him to 'discriminatory intimidation, ridicule, and insult.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21); *see Morgan*, 536 U.S. at 116.

Accordingly, the court affirms the judgments dismissing appellants' remaining *pro se* claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and reverses the orders on claims of racial disparate impact and discriminatory treatment that cross the line from conceivable to plausible, *Iqbal*, 556 U.S. at 680, which are remanded to the district court.